# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**RICKY A. LOBLEY,**

          **Petitioner,**

    **v.**                                    **Case No. 19-C-1795**

**BRIAN FOSTER,**

          **Respondent.**

---

### <u>DECISION AND ORDER</u>

Ricky Lobley petitions for a writ of habeas corpus under 28 U.S.C. § 2254. He alleges that his Wisconsin convictions for armed robbery, burglary, and false imprisonment were secured in violation of his Sixth Amendment right to effective assistance of counsel.

### I. BACKGROUND

Lobley's convictions stem from two armed robberies that took place on the same night in early December 2011 in Milwaukee. The first occurred at about 10:15 p.m. at an apartment located on Martin Luther King Drive. Four men wearing dark clothing and masks and carrying guns entered the apartment and robbed the occupants of three cell phones. The second robbery occurred between 2:45 a.m. and 3:00 a.m. at the home of Sharon Sanders. Three men entered the home and held Sanders and her three daughters at gunpoint before stealing an expensive leather jacket that contained $700 in cash.

After the second robbery, the police arrested Lobley and two other men—Lamar Robinson and Duron Means. Means eventually agreed to cooperate. He initially told the police that he, Lobley, and Robinson committed the armed robbery of Sanders's home.

When the police told Means that one of the phones the men were carrying at the time of their arrests was stolen in the apartment robbery, Means told the police that they committed that robbery, too. Later, Means also implicated a fourth man, Lequinis Strawder, in both robberies. Means and Strawder eventually pleaded guilty to charges arising out of the robberies, while Lobley and Robinson went to trial. As part of his cooperation agreement, Means was required to testify at Lobley and Robinson's trial.

Lobley and Robinson were tried together. At the trial, Sanders testified that, on the night of the robbery, she was at a bar with her boyfriend ordering food when she noticed three men at a table watching her. Sanders and her boyfriend exited the bar, and Sanders noticed the men follow them out. Sanders and her boyfriend entered Sanders's car and began driving to her home. Sanders, who was driving, noticed a Chevrolet Impala behind them and believed that it contained the men from the bar following her home. When Sanders was about a block away from her home, she swerved to the side of the road, at which time the Impala also swerved, struck the median, and sustained a flat tire. Sanders kept driving.

When Sanders arrived home, both she and her boyfriend went inside. About fifteen minutes later, her boyfriend left and noticed the Impala parked a short distance from the home. Sanders was inside sleeping on the couch, and her three daughters were asleep in their rooms. Sanders woke up when three men entered her house through the unlocked front door and demanded money. She testified that the men wore black clothing, that two of them wore masks, and that two of them carried guns. One of the men held Sanders at gunpoint while another pointed his gun at Sanders's daughters. Sanders recognized the man without a mask as one of the men who had

been watching her at the bar. Eventually, one of the gunmen went into Sanders's bedroom and found an expensive leather jacket that she had been wearing at the bar. He took the jacket, which contained $700 in the pocket. The three men left.

During direct examination, the prosecutor asked Sanders to identify a picture of her house and to confirm that it was in Milwaukee County. When Sanders answered yes, she volunteered that one of the robbers had been to her house at some point before the robbery. *See* ECF No. 7-15 at 41. The prosecutor did not follow up on Sanders's interjection. However, on cross-examination, Robinson's attorney asked about it. *Id.* at 45–46. He asked Sanders if she could identify the person who had been to her house as one of the two defendants in the courtroom. She said that she could not, and that she only knew his name, Ricky Lobley. When Robinson's attorney asked her if she had seen Lobley at her house on a previous occasion, she said no and that she only knew that he had been to her house because her son had told her. When Lobley's attorney cross-examined Sanders, he had her confirm that she never actually saw Lobley at her home, and that she only believed that he had been there because her son and her cousin's son were friends with Lobley and told her that he had been there. *Id.* at 68–70.

The trial court allowed the jurors to write questions for the judge to ask the witnesses. After Sanders's testimony, the jurors asked Sanders how she had "heard" that Lobley had been to her house. *Id.* at 81. She said that it was because her son and her cousin's son were friends with him and had told her. *Id.* Sanders volunteered that, after the robbery, her son and her cousin's son were reluctant to tell her that Lobley had

been to her house because she had told them to stop bringing people over to her house, which was in a nice neighborhood. *Id.*

Later during the trial, Duron Means testified about both robberies. He was the only witness who could place Lobley and Robinson at the scene of the earlier robbery of the apartment. The police obtained video showing four men with masks at the apartment building, but the video did not establish that Lobley or Robinson were among them. Means testified that both men participated in the robbery, and that three cell phones were taken.

Means testified that, after the apartment robbery, he, Lobley, Robinson, and Strawder drove around in a Chevrolet Impala and eventually picked up Strawder's ex-girlfriend. (Because Strawder's ex-girlfriend was a minor, she is identified in the state-court record by her initials, D.U.) They drove to the bar where Sanders was inside ordering food. The four men entered the bar and one of them noticed Sanders wearing an expensive leather jacket and decided he wanted it. The men followed Sanders out of the bar, got into the Impala, and followed Sanders's car. Means testified that none of the men knew Sanders when they first saw her at the bar. But eventually someone—Means did not remember who—recognized her as "somebody's mama or something like that." ECF No. 7-18 at 22. Means was driving, and he testified that, when Sanders swerved towards the median, he hit the median and got a flat tire, which he had to change. Means testified that "one of the guys in the car" knew where Sanders lived, *id.*, and that, after he fixed the flat, this person told Means how to get to Sanders's house, *id.* at 23.

Means parked the Impala on the street near Sanders's house. He testified that Lobley, Robinson, and Strawder got out of the car while he and D.U. remained inside.

Means testified that when he saw a police squad car coming down the street, he left the car and fled to a nearby apartment complex. A short time later, Lobley drove the car to where Means was, picked him up, and brought him back to Sanders's house. Means testified that the other three men wanted him to serve as a lookout while they entered the house. He said that he thought the men had two guns and that everyone was wearing masks.

Means testified that, after the robbery, all four men returned to the Impala. He testified that he, Lobley, and Robinson drove the Impala to his mother's house. Means couldn't remember what happened to Strawder, but he assumed he dropped Strawder and D.U. off somewhere before driving to his mother's house. About twenty minutes later, the police arrived at Means's mother's house and arrested Means, Lobley, and Robinson for the armed robbery of Sanders's house.

At the start of direct examination, the prosecutor asked Means to confirm that he was testifying at the trial pursuant to the terms of his cooperation agreement. The prosecutor noted that, under the agreement, the state agreed not to prosecute Means for the armed robbery of the apartment or the false imprisonment of Sanders and her children if he pleaded guilty to the armed robbery of Sanders and agreed to testify truthfully as a witness in the state's case against the other robbery suspects. ECF No. 7-18 at 17–18. At the end of her direct examination, the prosecutor asked Means to confirm that the cooperation agreement required him to tell the truth, and she asked him whether he had told the truth during his testimony. Means testified that he had told the truth. *Id.* at 38.

Later during the trial, D.U. testified. She said that, at about midnight on the night of the robberies, she was at a party when her ex-boyfriend, Lequinis Strawder, and another man picked up her and her friend in a Chevrolet Impala. D.U. did not know the other man (who must have been Means); she identified him only as "the tall guy." ECF No. 7-15 at 114. D.U. testified that, after they dropped off her friend at another house, the rest of the group drove to a Taco Bell for food. After that, the group picked up two other men. D.U. knew one of these men as "Little Ricky," and at trial she identified him as Lobley. D.U. did not know the other man who got into the car, but at trial she identified him as Robinson.

D.U. testified that, while the group of five was driving somewhere, the car hit a median and got a flat tire. D.U. did not remember stopping at a bar before this occurred. *Id.* at 109. Once the flat was changed, the men drove the car around the corner and parked on a street. D.U. testified that everybody got out of the car except her, and that no one told her what they were going to do. D.U. ended up waiting in the car for about fifteen minutes. While she was waiting, a police officer came to the window. The officer asked for her name and asked what she was doing in the car. D.U. said she was waiting for a friend. According to D.U., when the officer went back to his squad car, Lobley got into the car and drove it away. ECF 7-15 at 112–13. D.U. was worried that the police would chase them. She said that Lobley drove the car around the corner to the parking lot of an apartment building. About three minutes later, the other three men came running to the car. D.U. said that one of the men put something into the trunk, and that one of them had a gun. She said that all the men except Lobley were wearing "some black things on their face." *Id.* at 116. D.U. remembered one of the men stating that "the

Case 2:19-cv-01795-LA   Filed 07/15/20   Page 6 of 23   Document 17

door was open." *Id.* at 117. D.U. testified that, after everyone was back in the car, the group drove to Strawder's house and dropped her and Strawder off.

After D.U. finished her testimony, the officer who questioned her while she was in the car testified. He said that, when he approached the Impala and saw D.U. in the back seat, he tapped on the window to get her attention. When he asked her what she was doing, she said that she was waiting for her sister. The officer then returned to his squad car, entered D.U.'s name and the car's license plate into his computer, and learned to whom the car was registered. The officer returned to the car, confirmed that D.U. was okay, and then left. About five minutes later, the officer heard over the radio that squads were being dispatched to the same block where he had questioned D.U. He returned to the scene and gave the license plate and registration information about the Impala to the officers investigating the robbery.

Using the Impala's registration information, the officers went to the home of the vehicle's owner. The vehicle was not there, but the officers interviewed someone at the home. The information they obtained led them to Duron Means's mother's house, where they saw the Impala parked on the street with its lights on. When the officers approached the car, they saw Lobley exit a house and walk towards the car. Officers stopped Lobley and asked him if he had been in the car that night. He said yes. A short time later, Means and Robinson exited the house and were questioned by police. All three men were wearing dark clothing. After Means admitted to driving the car, the police arrested the three men and searched the car. They found Sanders's stolen jacket with cash in the pocket in the car's trunk. They also found a gun in the car's rear passenger seat pocket and a spare tire in the front seat.

7

When the officers took the three men into custody, they searched the men and seized cell phones they were carrying. About a month later, a detective received a bag containing the three phones and investigated them. The detective learned that one of the three phones was stolen during the apartment robbery that occurred on the same night as the robbery of Sanders's home. Because the police did not track which suspect carried which phone, they could not identify the suspect who was carrying the stolen phone when he was arrested. However, when the detective testified at trial, he said that one of the other phones—not the stolen phone—contained pictures of Lobley. The detective concluded that this other phone was likely Lobley's. ECF 7-17 at 81.

Lobley testified at the trial. He said that, on the night of the robberies, he was at his sister's house spending time with his nephews, their father, and a friend until about 3:45 a.m. Sometime after midnight, Robinson came to Lobley's sister's house. At about 3:45, Lobley and Robinson went across the street to Means's mother's house to smoke marijuana. Lobley testified that he noticed that the headlights of Means's car were on and that, when he told Means about it, Means asked him to go outside and turn them off. When he did so, he encountered the police and was arrested.

Robinson did not testify in his defense, but his mother testified and tried to provide an alibi. According to her, Robinson was at her house when both robberies occurred. She testified that, at about 3:15 a.m., Robinson left the house, but she did not know where he went.

During closing arguments, each defendant's attorney attacked Means's credibility by focusing on the favorable treatment he received in exchange for his testimony. The attorneys suggested that the state let Means off easy by not charging him for his role in

8

Case 2:19-cv-01795-LA   Filed 07/15/20   Page 8 of 23   Document 17

the apartment robbery and not charging him with false imprisonment for his role in the Sanders robbery. In her rebuttal, the prosecutor responded to this line of argument as follows:

> First, let's look at Duron Means. His statement is corroborated by all the other evidence in this case. He didn't get a pass on this case. He's currently charged with the same armed robbery as these two guys. He's charged with the armed robbery of Sharon Sanders. His agreement which I read to you says if he testifies truthfully and takes full responsibility, then I will amend the offense to the home invasion burglary. I haven't done that yet. He's currently facing the same armed robbery, but he testified truthfully, so I will be amending his count to the burglary. I never hid any of that from you. It's all in writing. I gave him this agreement back on May 14th. He confessed to that armed robbery of Sharon Sanders shortly after that offense occurred. He was given this cooperation agreement in May. He took responsibility, he's been cooperative, he told the truth, and he gets credit for that. He didn't get a pass. And if he didn't cooperate and identify these two people, then they would have gotten away with it.

ECF No. 7-20 at 71–72.

The jury found Lobley and Robinson guilty of armed robbery, burglary, and three counts of false imprisonment arising out of the robbery of Sanders's home. The jury acquitted both men of one count of false imprisonment arising out of the robbery of Sanders's home and of all counts stemming from the apartment robbery. The court sentenced Lobley to a total term of thirteen years in prison and six years of extended supervision.

Lobley filed a postconviction motion arguing, in relevant part, that he received ineffective assistance of counsel when his trial attorney failed to object to Sanders's testimony that Lobley was in her home at some point prior to the robbery. As indicated above, Sanders never saw Lobley in her home and testified that she believed he had been there only because her son had told her. Thus, Sanders's testimony was hearsay—she merely repeated what her son had told her—and was not admissible. But

9

her statement that Lobley had been to her home suggested that Lobley knew where she lived and thereby corroborated Means's testimony that someone in the car guided him to Sanders's home after he fixed the Impala's flat tire. However, the trial court denied the postconviction motion on the ground that Lobley could not show prejudice. The court found that the other evidence in the case—particularly the testimony of Means and D.U.—so strongly supported Lobley's guilt that the exclusion of Sanders's hearsay testimony would not have changed the outcome.

Lobley then filed a second postconviction motion, this time arguing that his counsel was ineffective in failing to object to the prosecutor's statement during her closing argument that Means testified truthfully. Lobley argued that the prosecutor had improperly vouched for the witness's credibility, and that therefore counsel should have objected. The trial court again found that, given the strength of the state's case against Lobley, he could not establish that he had been prejudiced by his counsel's allegedly deficient performance.

The Wisconsin Court of Appeals affirmed. In rejecting Lobley's ineffective-assistance claims, the court reasoned that, even if Lobley's counsel performed deficiently by failing to object to the hearsay and the vouching, Lobley could not show prejudice. In explaining why Lobley was not prejudiced by either failure, the court referred to its earlier summary of the evidence against him, which the court made in the course of discussing Lobley's claim that the prosecutor's improper vouching constituted plain error and thus was reviewable despite trial counsel's failure to object. As to the hearsay claim, the court reasoned:

> We conclude that the record demonstrated that Lobley was not
> prejudiced by [Sanders's] statements because there was more than

10

sufficient evidence to convict Lobley of the December 4, 2011 armed robbery as [party to a crime]. We rely on the previous summary of D.U.'s testimony, the testimony of the officer who spoke to D.U. as she waited in the Impala; the testimony of the officers who located the Impala, its contents (including [Sanders's] jacket), Lobley, Means, and Robinson near Means' residence; [Sanders's] testimony regarding the vehicle following her from the bar and her description of the clothing and masks of the armed robbers; and Lobley's admission that he had been in the Impala that night. Given the other strong non-hearsay evidence connecting Lobley with the December 4, 2011 armed robbery, he has not shown a "reasonable probability" that but for the alleged error, the outcome would have been different. Lobley has presented a faulty paradigm—the outcome of the charges against him relating to the December 4, 2011 armed robbery was not dependent on whether he directed the men to [Sanders's] home. Because Lobley has not shown prejudice, he has not established that trial counsel was ineffective.

ECF No. 1-3 at 15–15 (citations omitted).

As for the vouching claim, the court had previously determined, as part of its plain-error review, that the prosecutor improperly vouched for Means's credibility. But the court concluded that, even if trial counsel performed deficiently by not objecting to the vouching, Lobley was not prejudiced:

The jury's verdicts finding Lobley not guilty of the charges related to the December 3, 2011 armed robbery demonstrate that it was not influenced by the prosecutor's improper comment. Moreover, the evidence summarized above, from which we have intentionally omitted Means' testimony, demonstrates that given all the other evidence against Lobley, he has not shown a "reasonable probability" that the outcome of the trial would have been different without the prosecutor vouching for the truthfulness of Means' testimony.

*Id.* at 16 (citation omitted).

Lobley petitioned the Wisconsin Supreme Court for review, but his petition was denied. He then filed his federal petition, which raises the same ineffective-assistance claims he exhausted on direct appeal.

## II. DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to a habeas petition filed by a person in custody pursuant to a judgment of a state court. *See* 28 U.S.C. § 2254. It contains a deferential standard of review that prevents a federal court from granting the writ with respect to any claim that was adjudicated on the merits in state court unless the petitioner shows that the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* § 2254(d). The Wisconsin Court of Appeals adjudicated Lobley's claims of ineffective assistance of counsel on the merits, and therefore AEDPA's deferential standard of review applies here.

A claim of ineffective assistance of counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a claimant must show that his counsel performed deficiently and that he was prejudiced as a result. *Id.* at 687–94. To establish deficient performance, the claimant must demonstrate that counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. *Id.* at 687. This requires showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* To establish prejudice, the claimant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 694.

Here, Lobley contends that his counsel made two errors: (1) failing to object to Sanders's hearsay statement that Lobley had been to her house prior to the robbery, and (2) failing to object to the prosecutor's vouching for Means's credibility. I discuss each alleged error in turn. However, I do not lose sight of the fact that the *Strickland* standard applies to the totality of counsel's representation. *See Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). Thus, although I discuss the errors and their prejudicial effects separately, I also consider whether the cumulative effect of any errors resulted in deficient performance and prejudice. *See Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006).

## A. Failure to Object to Hearsay Testimony

Lobley claims that his trial counsel performed deficiently by failing to make a hearsay objection after Sanders testified that her son told her that Lobley had been to her house at some point prior to the robbery. Lobley contends that this testimony was prejudicial because it suggested to the jury that he knew where Sanders lived and therefore could have been the person who directed Means to her house after he fixed the Impala's flat tire. The Wisconsin Court of Appeals, however, found that the testimony was not prejudicial under *Strickland* because the other evidence in the case strongly supported Lobley's guilt.

Lobley argues that the court of appeals applied an incorrect standard for determining prejudice and therefore rendered a decision that involved an unreasonable application of *Strickland*. He points out that the court wrote that Lobley was not prejudiced by the hearsay because there was "more than sufficient evidence" to convict him of the robbery of Sanders's home. ECF No. 1-3 at 15. Lobley contends that the

court's use of this phrase shows that it conflated *Strickland*'s prejudice standard with the standard for determining whether the evidence was sufficient to support the jury's finding of guilt. However, reading the phrase alongside the rest of the paragraph in which it appears shows that the court did not conflate the two standards. After using the phrase "more than sufficient evidence," the court summarized the evidence of Lobley's guilt and then stated "[g]iven the other strong non-hearsay evidence connecting Lobley with the December 4, 2011 armed robbery, he has not shown a 'reasonable probability' that but for the alleged error, the outcome would have been different." *Id.* at 16. This statement of the *Strickland* standard was precisely correct, and it shows that the court understood how to properly assess prejudice.

Lobley also contends that the court of appeals erred by not weighing exculpatory evidence in its prejudice analysis. Here, Lobley points to his own alibi testimony, to certain alleged inconsistencies in D.U.'s testimony, and to the lack of DNA or fingerprint evidence tying him to the gun that the police found in the Impala. However, as I discuss below, this evidence does not show that the court of appeals rendered a decision that was contrary to, or involved an unreasonable application of, *Strickland*.

The evidence at trial conclusively proved that Means and the Impala were involved in the Sanders robbery, and that D.U. was present in the Impala at the time of the robbery. The evidence also conclusively proved that, besides Means, two other men participated in the robbery. The only issue for the jury was whether Lobley and Robinson were two of these men. The police arrested them near the Impala—which contained a gun and the spoils of the robbery—very shortly after the robbery occurred. At trial, Lobley testified that he was just in the wrong place at the wrong time. He said he

14

was at his sister's house all night, and that he just happened to go over to Means's house right before the police showed up. But Lobley's alibi was inconsistent with the testimony of the police officer who arrested him. This officer said that Lobley told him that he had been inside the Impala that night, *see* ECF No. 7-16 at 94, which he could not have been had he only been at his sister's house. During his testimony, Lobley did not provide an innocent explanation for this statement or deny having made it. Thus, Lobley's alibi testimony was very weak.

As for D.U.'s testimony, it was very strong evidence of Lobley's guilt. Unlike Means, D.U. had no apparent motive to fabricate her testimony.[1] Further, she had met Lobley prior to the night of the robbery and recognized him when he entered the Impala. She was able to pick him out of a police photo lineup shortly after the robbery and said she knew him as Little Ricky. When defense counsel cross-examined D.U. about whether it was too dark for her to get a good look at Lobley, she answered that it was not too dark to see him and reaffirmed that she knew exactly who he was. *See* ECF No. 7-16 at 3–5.

Lobley notes that D.U.'s testimony was inconsistent with some of the other evidence in the case. First, he observes that D.U. did not remember stopping at a bar between the time she entered the Impala and when it got a flat tire, and that therefore her testimony was inconsistent with the testimony of Means and Sanders on this point. However, this is a minor detail that could easily be explained by a memory lapse. Second, Lobley observes that D.U.'s testimony was inconsistent with Means's testimony

---

[1] Lobley suggests that D.U. might have falsely said that Lobley was one of the robbers to protect a friend. However, this is complete speculation on his part, as no evidence introduced at trial suggested that D.U. wanted to protect someone else.

about when he and Lobley exited and returned to the vehicle during the robbery, and about who drove the Impala after the robbery. Again, however, these are the kinds of details that could easily be misremembered. Third, Lobley notes that D.U. testified that Lobley drove the Impala away from the police squad car while the officer was preparing to return to the Impala, which suggests that Lobley fled from the police and would have been chased. Lobley contends that because the officer testified that he returned to the Impala and determined nothing was amiss, D.U. must have gotten this part of her story wrong. But the exact sequence of when the officer finished his investigation and when Lobley drove the car away from the scene is a detail that a witness could easily misremember over time.

In any event, it is unclear why any of these inconsistencies could be thought to undermine D.U.'s testimony about who participated in the robberies. The inconsistencies relate to the Impala's whereabouts and the exact sequence of events that occurred that night. At most, these inconsistencies might suggest that D.U. was lying about being in the car. But it was undisputed that D.U. was in the Impala that night and thus knew who else was in the car at the time of the robbery. D.U.'s failure to accurately recollect the details Lobley highlights does not suggest that she was lying about the identity of the other occupants or that she might have been mistaken about who they were.

Finally, the fact that Lobley's fingerprints and DNA were not found on the gun the police recovered from the Impala was not significant exculpatory evidence. The state did not need to prove that Lobley carried the gun during the robberies to convict him of

Case 2:19-cv-01795-LA   Filed 07/15/20   Page 16 of 23   Document 17

armed robbery as party to a crime. Although the lack of prints and DNA meant that the gun was not inculpatory, the lack of prints and DNA was not exculpatory, either.

Lobley next contends that the state court failed to account for the relevance of Lobley's acquittal of the apartment robbery. Lobley points out that because Means testified that Lobley was present during that robbery, the acquittal shows that the jury did not find Means credible. Thus, Lobley argues, something other than Means's testimony must have convinced the jury to convict him of the Sanders robbery. He then argues that it was Sanders's hearsay testimony that explains the difference in outcomes. Although Lobley acknowledges that D.U.'s testimony could also explain the difference, he contends that her testimony was flawed and therefore probably not what the jury relied on to convict him of the Sanders robbery. However, as I explained above, D.U.'s testimony was strong evidence of Lobley's guilt, and any inconsistencies in her testimony did not give rise to a plausible inference that she was lying about who was in the Impala at the time of the robbery. Moreover, the jury acquitted Robinson of the apartment robbery and convicted him of the Sanders robbery even though Sanders's hearsay testimony did not connect him to her house. In contrast, D.U.'s testimony implicated both Lobley and Robinson in the Sanders robbery. Thus, it was almost certainly D.U.'s testimony, rather than Sanders's hearsay, that caused the different outcomes.

I also note that Sanders's hearsay testimony was not quite as inculpatory as Lobley contends. Lobley contends that it was extremely inculpatory because it suggested to the jury that he was the one who directed Means to Sanders's house after the Impala got a flat tire. But for the jury to have drawn this inference, the testimony

Case 2:19-cv-01795-LA   Filed 07/15/20   Page 17 of 23   Document 17

would have had to have supported two propositions: (1) Lobley recognized Sanders at the bar as his friend's mother, and (2) Lobley knew where Sanders lived. Although the testimony supported the second proposition, it did not support the first. Sanders testified that she had never met Lobley and did not know what he looked like. But if Sanders and Lobley never met face-to-face, then it is not clear how Lobley could have recognized her at the bar and known that the person the men were following was his friend's mother.

Finally, I note that the prosecutor did not make use of Sanders's hearsay testimony at any point in the case, including during her closing argument. If the evidence was as damaging as Lobley contends, then this failure by the prosecutor is hard to explain.

For all these reasons, I conclude that the Wisconsin Court of Appeals reasonably applied *Strickland* in concluding that Lobley had not shown that he was prejudiced by his counsel's failure to object to the hearsay evidence. To be sure, the evidence was not helpful to Lobley's defense and might conceivably have played some role in the jury's decision to find him guilty. But, "[i]n assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Instead, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112. The Wisconsin Court of Appeals did not reach an unreasonable conclusion by determining that, here, the likelihood of a different result was not substantial.

Because I conclude that the court of appeals reasonably determined that Lobley did not suffer prejudice, I do not need to separately consider whether counsel's failure to

object was deficient performance. But, for the sake of completeness, I also note that the record does not permit me to find that counsel's failure was objectively unreasonable. First, counsel had no opportunity to object before Sanders gave the testimony. As noted, Sanders blurted out that Lobley had been to her house, and it wasn't established that her testimony was based on hearsay until Robinson's counsel brought that fact out on cross-examination. Thus, a hearsay objection would not have prevented the jury from hearing the information. Although counsel could have objected, moved to strike the testimony, and then asked the court to instruct the jury to disregard the testimony, this probably would not have cured any prejudice, since the jury would still have known that Sanders thought Lobley had been to her house. Under these circumstances, counsel could have reasonably believed that it was better to attack the veracity of the testimony during his own cross-examination (which he did by emphasizing Sanders' lack of personal knowledge, *see* ECF No. 7-15 at 69) rather than lodge an objection and move to strike.

Second, at the time Sanders testified, the full significance of the hearsay testimony wasn't known. Any prejudicial effect the statement had was due to Means's testimony that someone in the car knew Sanders as "somebody's mama" and was able to guide him to her house after the Impala got a flat tire. But Sanders testified a day before Means gave this testimony, and so counsel couldn't have factored the full prejudicial effect of Sanders's hearsay into his decision whether to object and move to strike. Lobley concedes this point, but he argues that the evidence was still obviously prejudicial because Sanders testified about the flat tire and therefore the jury would have been looking for an explanation as to how the robbers were able to find her house.

19

But Sanders testified that when the Impala got a flat tire, it was only a block and a half away from her house. ECF No. 7-15 at 33. It seems likely that the occupants of the Impala could have seen which driveway Sanders pulled into if her home was only a block and a half away from them. Thus, until Means testified and said that he needed guidance, the significance of the hearsay was not fully known.

Finally, I emphasize that "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington*, 562 U.S. at 110. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id.* Indeed, counsel does not even have to be "very good" to be constitutionally adequate. *Dean v. Young*, 777 F.2d 1239, 1245 (7th Cir. 1985). Thus, even if the "correct" approach to this problem was to object, move to strike, and then seek an instruction for the jury to disregard the testimony, it would not follow that Lobley's counsel performed deficiently.

## B.     Failure to Object to Vouching

Lobley next argues that his counsel performed deficiently by failing to object to the prosecutor's alleged improper vouching for Means's credibility during closing arguments. A prosecutor's "vouching" for the credibility of a witness can be prejudicial when it conveys the impression that the prosecutor knows of evidence not presented to the jury at trial that supports the witness's testimony. *See Jordan v. Hepp*, 831 F.3d 837, 847 (7th Cir. 2016). Vouching can also be prejudicial because "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust

the government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18–19 (1985).

Lobley contends that the prosecutor engaged in improper vouching in the course of discussing Means's agreement to cooperate with the state as part of his plea deal. As discussed more fully in the background section, above, this occurred during the prosecutor's rebuttal, after both Lobley's and Robinson's attorneys argued that Means got off easy in exchange for his favorable testimony. While arguing that Means did not get off easy, the prosecutor noted that the agreement required Means to testify truthfully at the trial before the state would drop any charges against him. She then said that because Means had testified truthfully at the trial, she would be dropping the charges relating to the apartment robbery. Lobley contends that the prosecutor's statement that Means testified truthfully and therefore was entitled to have the charges dropped was improper vouching.

The Wisconsin Court of Appeals agreed with Lobley that the prosecutor improperly vouched for Means's credibility. However, the court did not address whether trial counsel performed deficiently in failing to object to the vouching. Instead, it determined that, even if counsel performed deficiently, Lobley had not shown prejudice. The court gave two reasons for its conclusion. First, the court reasoned that the jury's acquitting Lobley of the apartment robbery demonstrated that it was not swayed by the prosecutor's vouching. Second, the court referred back to its discussion of prejudice in connection with the hearsay statement and said that the evidence in the case other than the hearsay and Means's testimony strongly supported the jury's finding of guilt. Thus,

the court determined that Lobley had not shown a reasonable probability that the outcome of the trial would have been different had his counsel objected to the vouching.

Here, Lobley argues that the court of appeals unreasonably determined that the evidence in the case other than Means's testimony and Sanders's hearsay strongly supported a finding of guilt. But for the reasons I explained in the context of the hearsay statement, the evidence of Lobley's guilt was extremely strong. Lobley had only a weak alibi defense, and D.U.'s testimony that he was a participant in the events that occurred while she was in the Impala was very credible.

More significantly, Lobley does not address the court of appeals' second reason for finding the vouching harmless, which was that the jury acquitted him of the apartment robbery even though Means testified that he was a participant. Clearly, this shows that the jury weighed the evidence for itself and did not merely trust the government's assessment of who was telling the truth. For this reason alone, I am compelled to find that the court of appeals did not unreasonably apply *Strickland* in concluding that Lobley had not shown that any vouching was prejudicial.

Because I conclude that the court of appeals reasonably found that Lobley did not show prejudice, I do not need to determine whether trial counsel performed deficiently by not objecting to the vouching. But, as with counsel's failure to object to the hearsay, I note that the record does not permit me to find that he did. It is at least arguable that the prosecutor's statement was not improper. She merely noted that Means satisfied the terms of his cooperation agreement by testifying truthfully. Although this could be viewed as the prosecutor's offering her own opinion of Means's credibility, trial counsel would not have been unreasonable in thinking that the comment did not

Case 2:19-cv-01795-LA   Filed 07/15/20   Page 22 of 23   Document 17

warrant an objection. Doubtless the jury already knew that the prosecutor believed Means was telling the truth because she entered into the cooperation agreement with him and offered his testimony at trial. By merely acknowledging that she intended to live up to her end of the cooperation agreement, the prosecutor did not imply that she knew of evidence not presented during the trial that showed Means was telling the truth. Notably, Robinson's counsel also failed to object to the vouching, even though Means's testimony implicated his client, too. This suggests that "prevailing professional norms" did not require an objection. *See Strickland*, 466 U.S. at 688.

### III. CONCLUSION

In sum, Lobley has not shown that the Wisconsin Court of Appeals unreasonably applied *Strickland* in concluding that he was not prejudiced by his trial counsel's failure to object to Sanders's hearsay testimony and to the prosecutor's alleged improper vouching. Moreover, Lobley has not shown that his counsel's representation fell below an objective standard of reasonableness. Accordingly, **IT IS ORDERED** that Lobley's petition for a writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that the petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 15th day of July, 2020.


s/Lynn Adelman_____
LYNN ADELMAN
District Judge

Case 2:19-cv-01795-LA   Filed 07/15/20   Page 23 of 23   Document 17